## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| KEVIN GARCIA, individually, and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, vs. | DEMAND FOR JURY TRIAL |
| DECISELY INSURANCE SERVICES, LLC and METLIFE SERVICES AND SOLUTIONS, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Kevin Garcia ("Plaintiff"), individually, and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against Defendants Decisely Insurance Services, LLC ("Decisely") and MetLife Services and Solutions, LLC ("MetLife") (together, "Defendants"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendants. Plaintiff makes the following allegations on information and belief, except as to his own actions, which are made on personal knowledge, the investigation of counsel, and the facts that are a matter of public record.

## INTRODUCTION

1.     This class action arises out of the recent targeted attack and data breach ("Data Breach") on Defendants' network that resulted in unauthorized access to

highly sensitive data. As a result of the Data Breach, Class Members (defined *infra*) suffered ascertainable losses in the form of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the present risk of imminent harm caused by the compromise of their sensitive personal information.

2.      Upon information and belief, the specific information compromised in the Data Breach includes, but is not limited to, personally identifiable information ("PII"), such as names, dates of birth, phone number, passport number, digital signature, and/or Social Security numbers.[1]

3.      Upon information and belief, Decisely held the PII of Plaintiff and Class Members due to Decisely's relationship with its customers, including MetLife, and their employers or benefit plan providers. Decisely stored the PII, unencrypted, in an Internet-accessible environment on its network, from which unauthorized actors used an extraction tool to retrieve sensitive PII belonging to Plaintiff and Class Members in December 2024.

4.      Plaintiff's and Class Members' PII—which was entrusted to Decisely, its officials, and agents—was compromised and unlawfully accessed due to the Data Breach.

---

[1] *See* https://decisely.com/wp-content/uploads/2025/06/decisely_website_notice_12560425-6.pdf.

5.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Plaintiff's and Class Members' PII that Defendants collected and maintained, and for Defendants' failure to provide timely and adequate notice to Plaintiff and other Class Members that their PII had been subject to the unauthorized access of an unknown, unauthorized party.

6.     Decisely maintained the PII in a negligent and/or reckless manner. In particular, the PII was maintained on Decisely's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

7.     In addition, upon information and belief, Defendants and their employees failed to properly monitor the computer network, IT systems, and integrated service that housed Plaintiff's and Class Members' PII.

8.     Also, MetLife failed to adequately vet, audit, monitor, or ensure the integrity of its security practices, including those of Decisely.

9.     Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct that resulted in the PII that Defendants collected and

maintained being in the hands of malicious cybercriminals. The risks to Plaintiff and Class Members will remain for their respective lifetimes.

10.    Defendants failed to provide timely, accurate, and adequate notice to Plaintiff and Class Members. Plaintiff's and Class Members' knowledge about the PII Defendants lost, as well as precisely what type of information was unencrypted and in the possession of unknown third parties, was unreasonably delayed by Defendants' failure to warn impacted persons immediately upon learning of the Data Breach.

11.    As remediation for allowing Plaintiff's and Class Members' PII to be acquired by an unauthorized third-party, Decisely has stated: "[w]e are also providing you with access to 12 months of identity monitoring services through Kroll."[2]

12.    Indeed, armed with the PII accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts in Class Members' names; taking out loans in Class Members' names; using Class Members' names to obtain insurance services; using Class Members' information to target other phishing and hacking intrusions using Class Members' information to obtain government benefits; filing fraudulent tax returns using Class Members' information; obtaining driver's licenses in Class Members' names but with another

---

[2] *Id.*

person's photograph; and giving false information to police during an arrest.

13.    As a result of the Data Breach, Plaintiff and Class Members have been exposed to a present, heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now closely monitor their financial accounts to guard against identity theft for the rest of their lives.

14.    Plaintiff and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.    By their Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data Breach.

16.    Accordingly, Plaintiff brings claims on behalf of himself and the Class for: negligence, breach of implied contract, breach of third-party beneficiary contract, unjust enrichment, and declaratory judgment and injunctive relief. Through these claims, Plaintiff seeks, *inter alia*, damages and injunctive relief, including improvements to Defendants' data security systems and integrated services, future annual audits, and adequate credit monitoring services.

## PARTIES

17.    Plaintiff is a natural person and citizen of Fresno, California.

18.    Decisely is formed in Delaware with its principal place of business

located at 12735 Morris Road, Suite 350, Alpharetta, Georgia 30004.

19.    MetLife is a limited liability company formed in Delaware with its principal place of business located at 200 Park Avenue, New York, New York 10166.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Classes are citizens of different states than Defendants, and there are over 100 putative Class Members.

21.    This Court has personal jurisdiction over Decisely because Decisely conducts substantial business in Georgia and this District. The Court has personal jurisdiction over MetLife because MetLife conducts substantial business in Georgia and this District.

22.    Venue is proper in this Court because Defendants transact business in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District. Moreover, Decisely maintains Plaintiff's and Class Members' PII in this District, and has caused harm to Plaintiff and Class Members in this District.

## BACKGROUND FACTS

23.    Decisely is a benefits brokerage and HR services firm specializing in integrated technology solutions for small businesses.[3]

24.    MetLife "is a leading global provider of insurance, annuities and employee benefit programs."[4]

25.    In order to conduct its business, Decisely requires that its client, MetLife, provide it with MetLife's client's PII.

26.    On information and belief, MetLife collects and maintains the PII of Plaintiff and Class Members, including but not limited to their as names, Social Security number, dates of birth, phone number, digital signature, and other information that MetLife may deem necessary to provide its services.

27.    MetLife provided Plaintiff's and Class Members' PII to Decisely in the ordinary course of business.

28.    Plaintiff and Class Members directly or indirectly entrusted Defendants with sensitive and confidential PII, which includes information that is static, does not change, and can be used to commit myriad financial crimes.

29.    Because of the highly sensitive and personal nature of the information Defendants acquire, store, and have access to, Defendants, upon information and

---

[3] *See* https://decisely.com/.
[4] *See* https://www.metlife.com/about-us/corporate-profile/.

belief, promised to, among other things: keep PII private; comply with industry standards related to data security and PII; inform individuals of their legal duties and comply with all federal and state laws protecting PII; only use and release PII for reasons that relate to insurance, annuities and employee benefit programs; and provide adequate notice to impacted individuals if their PII is disclosed without authorization.

30.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

31.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

32.     Plaintiff and the Class Members relied on Defendants to implement and follow adequate data security policies and protocols, to keep their PII confidential and securely maintained, to use such PII solely for business purposes, and to prevent the unauthorized disclosures of the PII.

**A.     Defendants Fail to Safeguard Consumer PII.**

33.     On or about June 13, 2025, Decisely began notifying its customers of the Data Breach. On its website, it posted a Notice of Data Security Incident ("Notice Letter), which states:

Recently, we learned that some personal and/or protected health information may have been involved in a data security incident we experienced. The incident began on December 17, 2024, when we discovered suspicious activity related to our cloud storage platform. We promptly took steps to secure the environment and began an investigation to determine the nature and scope of the issue. We engaged cybersecurity experts to conduct an investigation into what happened and to assist us with determining whether personal information was accessed or acquired without authorization. The investigation determined that some data may have been acquired on December 16, 2024. We then completed a comprehensive analysis of the data potentially involved to identify what personal and/or protected health information was impacted and to whom it belonged. We also notified associated owners of the data and worked with them to determine contact information necessary to provide this notice of what happened.

. . . .

Based on the review of potentially impacted data, the following information may have been affected as a result of the incident: names, dates of birth, phone number, passport number, digital signature, and/or Social Security numbers. Individuals began receiving notification of this incident on June 13, 2025.[5]

34.    Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data of specific individuals, including (among other things) the PII of Plaintiff and the Class Members.

35.    Plaintiff further believes his PII was likely subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals.

---

[5] *See* https://decisely.com/wp-content/uploads/2025/06/decisely_website_notice_12560425-6.pdf.

36.    Defendants had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties.

37.    Because of the Data Breach, data thieves were able to gain access to Decisely's cloud storage platform on December 16, 2024, and were able to compromise, access, and acquire the protected PII of Plaintiff and Class Members.

38.    Defendants had obligations created by contract, industry standards, common law, and its own promises and representations made to Plaintiff and Class Members to keep their PII confidential and to protect them from unauthorized access and disclosure.

39.    Plaintiff and the Class Members reasonably relied (directly or indirectly) on Defendants' sophistication to keep their sensitive PII confidential; to maintain proper system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

40.    Plaintiff's and Class Members' unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions, and due to the utter failure to protect Class Members' PII. Criminal hackers obtained their PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The risks to Plaintiff and Class Members will remain for their respective lifetimes.

41.    Thus, on information and belief, Plaintiff's and Class Members' PII

has already been published—or will be published imminently—on the dark web by cybercriminals.

## B.    Defendants were on Notice of the Foreseeable Risk of the Data Breach.

42.    In light of recent high profile data breaches, Defendants knew or should have known the electronic records and PII it maintained would be targeted by cybercriminals and ransomware attack groups.

43.    Defendants knew or should have known that these attacks were common and foreseeable.

44.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[6] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[7]

45.    Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

## C.    Defendants Fail to Comply with FTC Guidelines.

---

[6] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[7] *Id.*

46.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

47.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.[8] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[9]

48.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data;

---

[8] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jun. 20, 2025).
[9] *Id.*

require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

49.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

50.    These FTC enforcement actions include actions against entities like Defendants.

51.    Defendants failed to properly implement basic data security practices.

52.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customers and other impacted individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

53.    Defendants were at all times fully aware of their obligations to protect the PII. They were also aware of the significant repercussions that would result from their failure to do so.

**D.    Defendants Fail to Comply with Industry Standards.**

54.    Several best practices have been identified that at a minimum should be implemented by companies storing sensitive PII like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; limiting which employees can access sensitive data; and vetting, monitoring, and ensuring the integrity of vendor data security practices.

55.    Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

56.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

57.    These foregoing frameworks are existing and applicable industry standards, and Defendants failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**E.    Defendants' Breach**

58.    Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    failing to adequately protect PII;

c.    failing to properly monitor their own data security systems for existing intrusions;

d.    failing to adequately vet, audit, monitor, or ensure the integrity of vendor data security practices;

e.    failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;

f.    failing to ensure the confidentiality and integrity of electronic PII they created, received, maintained, and/or transmitted;

g.    failing to implement technical policies and procedures for electronic

information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights;

h.      failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

i.      failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

j.      failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PII;

k.      failing to train all members of their workforces effectively on the policies and procedures regarding PII;

l.      failing to render the electronic PII they maintained unusable, unreadable, or indecipherable to unauthorized individuals;

m.      failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTCA;

n.      failing to adhere to industry standards for cybersecurity as discussed above; and

o.      otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' PII.

59.    Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access Decisely's cloud storage platform, which provided unauthorized actors with unsecured and unencrypted PII.

60.    Accordingly, as outlined below, Plaintiff and Class Members now face a present, increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendants.

**F.    Value of Personal Identifiable Information**

61.    The Personal Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200. Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web. Criminals can also purchase access to entire company data breaches from $900 to $4,500.

62.    Cyberattacks and data breaches at companies like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

63.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of

identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[10]

64.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

---

[10] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, U.S. GOV. ACCOUNTING OFFICE, (2007) https://www.gao.gov/new.items/d07737.pdf.

65.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[11]

66.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

67.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

68.    Moreover, theft of PII is also gravely serious because PII is an

---

[11] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last accessed Jun. 20, 2025).

extremely valuable property right.[12]

69.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

70.    Notably, there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used.

71.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

72.    PII is such a valuable commodity to identity-thieves that once the

---

[12] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[13] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO-07-737, U.S. GOV. ACCOUNTING OFFICE, (2007) https://www.gao.gov/new.items/d07737.pdf.

information has been compromised, criminals often trade the information on the "cyber black-market" for years.

73.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

74.    Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

75.    PII can sell for as much as $363 per record according to the Infosec Institute.[14] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for many years.

76.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[15] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make

---

[14] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[15] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION (2018) at 1, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jun. 20, 2025).

it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[16] Each of these fraudulent activities is difficult to detect. An individual may not know their Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

77.    Moreover, it is not an easy task to change or cancel a stolen Social Security number.

78.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

79.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black

---

[16] *Id* at 4.

[17] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

market."[18]

80.    Defendants knew or should have known about these dangers and strengthened their data and email handling systems accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendants failed to properly prepare for that risk.

## G.    Plaintiff's and Class Members' Damages

81.    To date, Defendants have done nothing to provide Plaintiff and the Class Members with relief for the damages they have suffered as a result of the Data Breach.

82.    Decisely has merely offered Plaintiff and Class Members complimentary identity monitoring services for up to one year, but this does nothing to compensate them for damages incurred and time spent dealing with the Data Breach.

83.    Plaintiff and Class Members have been damaged by the compromise of their PII in the Data Breach.

84.    Plaintiff and Class Members' PII were compromised in the Data Breach and are now in the hands of the cybercriminals who accessed

---

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, COMPUTER WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

Defendants' software maintaining PII. This PII was acquired by some unauthorized, unidentified third-party threat actor.

85.    Since being notified of the Data Breach, Plaintiff has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

86.    Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis trying to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring their accounts for fraudulent activity.

87.    Plaintiff's PII was compromised as a direct and proximate result of the Data Breach.

88.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

89.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

90.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and

similar identity theft.

91.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

92.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

93.    Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

94.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and sensitive information for misuse.

95.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

        a.    reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.    purchasing credit monitoring and identity theft prevention;

c.    placing "freezes" and "alerts" with reporting agencies;

d.    spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.    contacting financial institutions and closing or modifying financial accounts; and

f.    closely reviewing and monitoring Social Security numbers, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

96.    Moreover, Plaintiff and Class Members have an interest in ensuring their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of adequate security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online and that access to such data is password protected.

97.    Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

98.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

***Plaintiff's Experience***

99.    Plaintiff provided his PII to MetLife as a condition of employee benefits.

100.    Plaintiff provided his PII to MetLife and indirectly to Decisely and trusted they would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law.

101.    Plaintiff received a Notice Letter stating the following information may have been involved in the Data Breach: name, Social Security number, date of birth, phone number, and digital signature.[19]

102.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

103.    As a result of the Data Breach, Plaintiff has been forced to spend time dealing with and responding to the direct consequences of the Data Breach. This is uncompensated time that has been lost forever and cannot be recaptured.

---

[19] *See* Notice of Data Breach sent to Plaintiff on June 13, 2025, attached as **Exhibit A.**

104.    Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of his life, that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

105.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendants maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

106.    As a result of the Data Brach, Plaintiff has experience two-three instances of attempted fraudulent charges on his credit card. As a result, Plaintiff had to reset automatic billing instructions ties to compromised accounts.

107.    In addition, Plaintiff receives many spam texts, calls, and emails, which was not typical before the Data Breach. He cannot figure out any other explanation than that it is related to Defendant's Data Breach which included his PII.

108.    As a result of the Data Breach, Plaintiff has also suffered emotional distress as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud.

Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

109.   As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of his life.

110.   Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants possession, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

111.   Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated under Federal Rule of Civil Procedure 23.

> All persons whose PII was compromised in the Data Breach, including all who were sent a Notice Letter ("Class").

112.   Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

113.   Plaintiff reserves the right to amend or modify the Class definition or

add a subclass as this case progresses.

114.   <u>Numerosity</u>. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals whose sensitive data was compromised in the Data Breach.

115.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   if Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

b.   if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   if Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.   if Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e.   if Defendants owed a duty to Class Members to safeguard their PII;

f.   if Defendants breached their duty to Class Members to safeguard their

PII;

g.    if Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h.    if Defendants should have discovered the Data Breach sooner;

i.    if Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j.    if Defendants' conduct was negligent;

k.    if Defendants breached implied contracts with Plaintiff and Class Members;

l.    if Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.    if Defendants failed to provide notice of the Data Breach in a timely manner; and

n.    if Plaintiff and Class Members are entitled to damages, punitive damages, treble damages, and/or injunctive relief.

116.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

117.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's Counsel are

competent and experienced in litigating class actions.

118.   <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

119.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

120.   Defendants have acted on grounds that apply generally to the Class as

a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

121.   Likewise, particular issues under Federal Rule of Civil Procedure 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    if Defendants failed to timely notify the public of the Data Breach;

b.    if Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.    if Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    if Defendants' failure to institute adequate protective security measures amounted to negligence;

e.    if Defendants failed to take commercially reasonable steps to safeguard consumer PII; and

f.    if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

122.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Decisely.

### FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Class Against Decisely)**

123.   Plaintiff repeats and re-allege paragraphs 1 through 122 of this Complaint and incorporate them by reference herein.

124.   Plaintiff and the Class entrusted Decisely with their PII on the premise and with the understanding that Decisely would safeguard their information, use their PII for admissions purposes only, and/or not disclose their PII to unauthorized third parties.

125.   Decisely has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

126.   By collecting and storing this data in their computer system and network, and sharing it and using it for commercial gain, Decisely owed a duty of care to use reasonable means to secure and safeguard their computer system—and Plaintiff's and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Decisely's duty included

a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

127.    Decisely owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

128.    Decisely's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Decisely and individuals who entrusted them with PII, which is recognized by laws and regulations, as well as common law Decisely was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

129.    Decisely's duty to use reasonable security measures required Decisely to reasonably protect confidential data from any intentional or unintentional use or disclosure.

130.    In addition, Decisely had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential

data.

131.    Decisely's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Decisely is bound by industry standards to protect confidential PII.

132.    Decisely breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Decisely include, but are not limited to, the following:

a.    failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b.    failing to adequately vet, audit, monitor, or ensure the integrity of vendor data security practices;

c.    failing to adequately monitor the security of their networks and systems;

d.    failing to have in place mitigation policies and procedures;

e.    allowing unauthorized access to Plaintiff's and Class Members' PII;

f.    failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

g.    failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the

potential for identity theft and other damages.

133.    Decisely owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Decisely also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the data breach.

134.    Plaintiff and Class Members are also entitled to injunctive relief requiring Decisely to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

135.    Decisely breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

136.    Decisely owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Decisely knew or should have known would suffer injury-in-fact from Decisely's inadequate security protocols. Decisely actively sought and obtained

Plaintiff's and Class Members' PII.

137.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Decisely holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Decisely's databases containing the PII—whether by malware or otherwise.

138.    PII is highly valuable, and Decisely knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

139.    Decisely breached its duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiff and Class Members—which actually and proximately caused the Data Breach and injured Plaintiff and Class Members.

140.    Decisely further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact. As a direct and traceable result of Decisely's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

141.    Decisely's breach of its common-law duties to exercise reasonable

care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Decisely's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class Against MetLife)

142.    Plaintiff repeats and re-allege paragraphs 1 through 122 of this Complaint and incorporate them by reference herein.

143.    Plaintiff and the Class entrusted MetLife with their PII on the premise and with the understanding that MetLife would safeguard their information, use their PII for admissions purposes only, and/or not disclose their PII to unauthorized third parties.

144.    MetLife has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

145.    By collecting and storing this data in their computer system and network, and sharing it and using it for commercial gain, MetLife owed a duty of

care to use reasonable means to secure and safeguard their computer system—and Plaintiff's and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. MetLife's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

146.    MetLife owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

147.    MetLife's duty of care to use reasonable security measures arose as a result of the special relationship that existed between MetLife and individuals who entrusted them with PII, which is recognized by laws and regulations, as well as common law. MetLife was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

148.    MetLife's duty to use reasonable security measures required MetLife to reasonably protect confidential data from any intentional or unintentional use or disclosure.

149.    In addition, MetLife had a duty to employ reasonable security

measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair .

. . practices in or affecting commerce," including, as interpreted and enforced by

the FTC, the unfair practice of failing to use reasonable measures to protect

confidential data.

150.    MetLife's duty to use reasonable care in protecting confidential data

arose not only as a result of the statutes and regulations described above, but also

because MetLife are bound by industry standards to protect confidential PII.

151.    MetLife breached its duties, and thus was negligent, by failing to use

reasonable measures to protect Plaintiff's and Class Members' PII. The specific

negligent acts and omissions committed by MetLife include, but are not limited to,

the following:

a.    failing to adopt, implement, and maintain adequate security measures
      to safeguard Plaintiff's and Class Members' PII;

b.    failing to adequately monitor the security of their networks and
      systems;

c.    failing to have in place mitigation policies and procedures;

d.    allowing unauthorized access to Plaintiff's and Class Members' PII;

e.    failing to detect in a timely manner that Plaintiff's and Class Members'
      PII had been compromised; and

f.    failing to timely notify Plaintiffs and Class Members about the Data

Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

152.   MetLife owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their PII. MetLife also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the data breach.

153.   Plaintiff and Class Members are also entitled to injunctive relief requiring MetLife to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

154.   MetLife breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

155.   MetLife owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom MetLife knew or should have known would suffer injury-in-fact from

MetLife's inadequate security protocols. MetLife actively sought and obtained Plaintiff's and Class Members' PII.

156.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that MetLife holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access MetLife's databases containing the PII—whether by malware or otherwise.

157.    PII is highly valuable, and MetLife knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

158.    MetLife breached its duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiff and Class Members—which actually and proximately caused the Data Breach and injured Plaintiff and Class Members.

159.    MetLife further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact. As a direct and traceable result of MetLife's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

160.   MetLife's breach of its common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by MetLife's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class Against MetLife)**

161.   Plaintiff repeats and re-allege paragraphs 1 through 122 of this Complaint and incorporate them by reference herein.

162.   Plaintiff and Class Members were required to provide their PII to MetLife as a condition of receiving employee benefits provided by MetLife.

163.   Plaintiff and Class Members reasonably understood that a portion of the funds they paid MetLife would be used to pay for adequate cybersecurity measures.

164.   Plaintiff and Class Members reasonably understood that MetLife would use adequate cybersecurity measures to protect the PII that it was required to provide based on MetLife's duties under state and federal law and its internal

policies.

165.    Plaintiff and the Class Members accepted MetLife's offers by disclosing their PII to MetLife in exchange for employee benefits.

166.    In turn, and through internal policies, MetLife agreed to protect and not disclose the PII to unauthorized persons.

167.    Implicit in the parties' agreement was that MetLife would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

168.    After all, Plaintiff and Class Members would not have entrusted their PII to MetLife in the absence of such an agreement with MetLife.

169.    Plaintiff and the Class fully performed their obligations under the implied contracts with MetLife.

170.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

171.    Subterfuge and evasion violate the duty of good faith in performance

even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

172.    MetLife materially breached the contracts it entered with Plaintiff and Class Members by:

a.    failing to safeguard their information;

b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.    failing to comply with industry standards;

d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

173.    In these and other ways, MetLife violated its duty of good faith and fair dealing.

174.    MetLife's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as alleged *supra*).

175.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

176.    Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by MetLife's conduct.

**FOURTH CAUSE OF ACTION**
**Breach of Third Party Beneficiary Contract**
**(On behalf of Plaintiff and the Class against Decisely)**

177.   Plaintiff repeats and re-allege paragraphs 1 through 122 of this Complaint and incorporate them by reference herein.

178.   Upon information and belief, Decisely entered into virtually identical contracts with its customers, including MetLife, to provide services, which included data security practices, procedures, and protocols sufficient to safeguard the PII that was to be entrusted to it.

179.   Such contracts were made expressly for the benefit of Plaintiff and the Class, as it was their PII that Defendants agreed to receive and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties, and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

180.   The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract

in addition to its form.

181.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

182.    MetLife materially breached the contracts it entered with Plaintiff and Class Members by:

a.    failing to safeguard their information;

b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.    failing to comply with industry standards;

d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

183.    In these and other ways, Decisely violated its duty of good faith and fair dealing.

184.    Decisely knew that if it were to breach these contracts with its clients, Plaintiff and the Class would be harmed.

185.    Decisely breached its contracts with its clients, including MetLife, and, as a result, Plaintiff and Class Members were affected by this Data Breach when

Decisely failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

186.   As foreseen, Plaintiff and the Class were harmed by Decisely's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their PII.

187.   Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class Against Defendants)

188.   Plaintiff repeats and re-allege paragraphs 1 through 122 of this Complaint and incorporate them by reference herein.

189.   This count is pleaded in the alternative to Plaintiff's breach of implied contract claims.

190.   Plaintiff and Class Members conferred a monetary benefit on Defendants by providing Defendants with their valuable PII. In so conferring this benefit, Plaintiff and Class Members understood that part of the benefit Defendants derived from the PII would be applied to data security efforts to safeguard the PII.

191.   Defendants enriched themselves by saving the costs they reasonably

should have expended on data security measures to secure Plaintiff's and Class Members' PII.

192.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

193.    Under the principle of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

194.    Defendants acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

195.    If Plaintiff and Class Members knew that Defendants had not secured their PII, they would not have agreed to provide their PII to them.

196.    Plaintiff and Class Members have no adequate remedy at law.

197.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

(i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures as long as they fail to undertake appropriate and adequate measures to protect PII in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the impact of the PII comprised as a result of the Data Breach for the reminder of the lives of Plaintiff and Class Members.

198.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

199.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## SIXTH CAUSE OF ACTION
### Declaratory Judgment and Injunctive Relief
### (On Behalf of Plaintiff and the Class Against Defendants)

200.  Plaintiff repeats and re-allege paragraphs 1 through 122 of this Complaint and incorporate them by reference herein.

201.  Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

202.  An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to employing reasonable data security. Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of new or additional fraud against them or on their accounts using the stolen data.

203.  Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendants owed, and continue to owe, a legal duty to employ reasonable data security to secure the PII it possesses, and to notify

impacted individuals of the Data Breach under the common law and Section 5 of the FTCA;

b.    Defendants breached, and continue to breach, their duty by failing to employ reasonable measures to secure their customers' personal and financial information; and

c.    Defendants' breach of their legal duty continues to cause harm to Plaintiff and the Class.

204.    The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect its customers' (*i.e.,* Plaintiff's and the Class's) data.

205.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

206. The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued.

207. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A.  For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B.  For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.  For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order;

    i.  prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.    prohibiting Defendants from maintaining the PII of

Plaintiff and Class Members on a cloud-based database;

vii.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

viii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

xi.    requiring Defendants to conduct regular database scanning and securing checks;

xii.    requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.    requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.    requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xv.     requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect himself; and

xvii.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's

final judgment;

D.    For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demand that this matter be tried before a jury.

Dated: June 23, 2025          Respectfully Submitted,

By: */s/Casondra Turner*_____
Casondra Turner (GA Bar No. 418426)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
Fax: (771) 772-3086
cturner@milberg.com

Jeff Ostrow (*Pro hac* vice forthcoming)
**KOPELOWITZ OSTROW P.A.**
One W. Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301
Tel: (954) 990-2218
ostrow@kolawyers.com

*Attorneys for Plaintiff and the Proposed
Class*